[Civ. No. 2325.   Third Appellate District.—October 15, 1921.]

BERTHA STEINHOFER et al., Respondents, v. F. W. GEORGESON, as Executor, etc., Appellant.

[1] ESTATES OF DECEASED PERSONS—ACTION FOR SERVICES—AGREEMENT OF PARTIES—EVIDENCE—FINDING.—In this action against an executor to recover a balance alleged to be due to plaintiffs for personal services rendered and moneys expended for the defendant's testate during her lifetime, the evidence was sufficient to warrant the conclusion of the jury that the agreement for caring for the deceased, as originally made with her agent, did not include services as a nurse and the constant attention which, it developed after the deceased had been in the home of the plaintiffs for a short period, was absolutely necessary to make her as comfortable as she could be made under the circumstances, and that such agent, subsequent to the making of the original agreement, promised to pay additional compensation for the required additional services.

[2] ID.—PROOF OF SERVICES—RECOVERY OF COMPENSATION—PAYMENT—BURDEN OF PROOF.—In such action, it having been admitted that a certain sum had been paid on account, the proof of the services rendered was sufficient to entitle the plaintiffs to recover any balance that might be due, the burden of proving the payment of the account being upon the defendant.

[3] ID.—BOOK ENTRIES—ABSENCE OF PERSONAL KNOWLEDGE—RIGHT TO REFRESH MEMORY FROM. — In an action against an executor to recover a sum of money for goods had and received by the deceased during the latter's lifetime and while she was at the home of plaintiffs, it is error to permit a daughter of the plaintiffs to refresh her memory from the entries made by her in a book at or about the time the goods were furnished, where such entries were

not based on facts within her own personal knowledge, but on facts which had come to her knowledge only through the statements or declarations of her mother or others.

APPEAL from a judgment of the Superior Court of Humboldt County. Denver Sevier, Judge. Affirmed.

The facts are stated in the opinion of the court.

Puter & Quinn for Appellant.

W. Ernest Dickson for Respondents.

HART, J.—The action is to recover the sum of $2,059.43, alleged to be a balance due the plaintiffs for personal services rendered and moneys expended for the appellant's testate during her lifetime.

The plaintiff, Bertha Steinhofer, is the real or actual plaintiff in the case, her husband, Herman M. Steinhofer, being but a nominal party plaintiff, he having been joined with his wife as plaintiff because the moneys alleged to be due her from the defendant constitute community property.

The cause was tried before a jury and a verdict returned in favor of the plaintiffs for the sum of $2,024.43. Thereupon judgment was entered for the plaintiffs in said sum. Thereafter a motion for a new trial was made by the defendant and denied by the court.

The defendant prosecutes this appeal from the judgment.

The complaint is in four counts. In the first it is alleged that the deceased, in her lifetime, became indebted to the plaintiff, Bertha Steinhofer, in the sum of $525 for board and room furnished deceased by said plaintiff for twenty-one months, at the agreed price of $25 per month. The second count is upon a *quantum meruit* and a *quantum valebat,* and therein it is alleged that the deceased became indebted to plaintiff for services rendered and goods furnished by plaintiffs for deceased for her use and benefit and at her special instance and request, "as shown by items 2, 3, 4 and 5 of Exhibit 'A' which is hereby referred to and made a part hereof," the said exhibit being an itemized account of the services and goods alleged to have been so furnished. It is alleged that the services so rendered and the goods so furnished were and are reasonably worth the

sum of $1,920. In the third count it is alleged that the plaintiffs advanced money for goods had and received by deceased during her lifetime and for her use and benefit and at her special instance and request, amounting to the sum of $69.43, as shown by the itemized list above referred to. The fourth count is upon a *quantum meruit* for work and labor performed for deceased at her special instance and request by one Otto Steinhofer, son of the plaintiffs, it being alleged that said services were and are reasonably worth the sum of $35, and that the claim therefor was prior to the institution of this action and for a valuable consideration assigned and transferred to the plaintiffs. As to this last count or cause for action, it may be stated that the same was dismissed during the progress of the trial upon motion of counsel for the plaintiffs.

It is alleged in each count of the amended complaint that the several claims therein set up were duly presented to the defendant as executor of the last will of the deceased and that the same were rejected by said executor. The answer of the defendant specifically denies each and every material allegation of the complaint.

The principal question presented here for decision is founded upon the assignment that the evidence was insufficient to justify the verdict. It is also claimed that the court erred to the prejudice of the defendant in certain rulings upon the evidence.

As to the question of the sufficiency of the evidence to support the verdict, the specific contention of the defendant is that an express agreement was entered into between Mr. L. M. Puter, the attorney and agent of the deceased, and Mrs. Bertha Steinhofer, by the terms of which the latter was to furnish board and lodging to the deceased and to take care of her at the rate of $25 per month. On the other hand, it is contended by the plaintiffs that the original agreement between Mr. Puter and Mrs. Steinhofer was that she was merely to furnish board and lodging to the deceased for the sum of $25 per month, and that there was no agreement then entered into between them as to taking care of the deceased, who, it appears from the evidence, was a woman of some seventy years of age, feeble in health, and who needed constant attention. The plaintiff, Mrs. Bertha Steinhofer, was, under the terms of section

1880 of the Code of Civil Procedure, precluded from testifying as to the agreement or the terms thereof, and, therefore, it was necessary for the plaintiffs to establish their case by the testimony of other witnesses. The record, which is brought here under the alternative method, is voluminous so far as the testimony is concerned, but it will not be necessary to enter herein into a detailed or minute review of the testimony for the purpose of showing, as we are persuaded, after an examination of said testimony, is true, that there is a conflict in the evidence upon the character and scope of the agreement between Mr. Puter and the plaintiff, Bertha Steinhofer. It will suffice to state the facts as they were established by the evidence in a general way. The agreement between Mr. Puter and Mrs. Steinhofer was not reduced to writing and consequently the terms thereof must be determined, as they were required to be determined by the jury, upon parol testimony.

Contrary to the usual custom in dealing with the questions of fact in an opinion, we will first advert to the testimony of Mr. Puter, who was a witness for the defendant, for the purpose of showing the circumstances under which the deceased went to the home of the plaintiffs to reside. First, it should be explained that the deceased was, at the time she was brought to the home of the plaintiffs, the owner of a ranch situated some distance frm the city of Eureka, in Humboldt County, and that she had practically been living alone on said ranch. It also appears that the deceased was approximately of the age of seventy years and in feeble health, due jointly to her physical ailments and venerable years. The evidence shows without conflict— indeed, it was admitted by Mr. Puter—that Mrs. Carroll was addicted to the excessive use of morphine, cigarettes, and intoxicating liquors, and it is thus reasonable to infer that her enfeebled condition was due to some extent to the use of these stimulants. At any rate, it was conceived that the state of her physical health was such as to make it necessary to surround her by conditions more conducive to her personal comfort and welfare than those existing on her ranch. In pursuance of this plan, Mr. L. M. Puter, who was her legal adviser and looked after her business interests, acting for her as her agent, made arrangements with the plaintiff, Mrs. Bertha Steinhofer, whereby the deceased should be

taken into the home of the latter and there remain until such time as she might regain her health or until she should pass out of this life. Accordingly, the deceased was taken to the home of the plaintiff in the month of December, 1915, and remained there, under the care of Mrs. Bertha Steinhofer, until the time of her death, which occurred on August 23, 1917, a period of twenty-one months. Mr. Puter positively testified that the understanding or agreement between him and Mrs. Bertha Steinhofer was that the latter should take the deceased into her home and there furnish her with board and lodging and otherwise look after her for the sum of $25 per month. He likewise declared that this agreement distinctly included whatever attention the deceased might require and also the washing of her clothes. He further testified that he said to Mrs. Steinhofer that she (Mrs. Steinhofer) could purchase at certain stores with which he (Puter) had made arrangements for that purpose such articles as might be required or necessary for the needs and comfort of the deceased. This, he repeatedly asseverated, was the full scope of the agreement between him and Mrs. Steinhofer. Counsel for the defendant insist here that there was no contradiction of the testimony of Mr. Puter with regard to the terms and scope of the agreement as so explained. We are, however, as before stated, not prepared to accept that view.

The daughter of Mrs. Steinhofer, Mrs. Laura Sievert, testified that, a short time after the deceased was taken to her mother's home, she overheard a conversation between her mother and Mr. Puter in which her mother said to Mr. Puter that she had found that the deceased was practically helpless, was unable to take care of herself and required constant attention, and that she, therefore, could not afford to keep her at her home, furnish her with board and lodging, and give her the care and attention which she required, for the sum of $25 per month; that Mr. Puter replied that he desired Mrs. Steinhofer to board and lodge and take care of the deceased in a proper way and that he would pay her well for her services. In fact, this witness testified that she heard similar conversations between Puter and her mother on several different occasions, and that Puter always substantially promised to pay Mrs. Steinhofer additional compensation for her services as a

nurse. She further testified that she heard the deceased, Mrs. Carroll, say to her mother on divers occasions that she (Mrs. Carroll) knew that she was "a great care" and required a great amount of attention, and that she desired and intended to compensate Mrs. Steinhofer well for her services. In fact, the witness proceeded, Mrs. Carroll had at several different times drawn her own check for a certain sum on the bank in favor of Mrs. Steinhofer, as in payment for the latter's services and accommodations, but it appeared that all her money was deposited in the bank in the name of Mr. Puter and that consequently her checks were returned marked, "no funds."

That the physical condition of the deceased was such as to imperatively require the services of a nurse during the period of time that she was at Mrs. Steinhofer's is shown by the testimony of Mrs. Sievert, who positively declared that the deceased had to be helped to the table when meals were served, had to be assisted to her room and required almost the constant attention of her mother every day, and during the last three months of her illness her mother had to be with and attend the deceased almost every hour of the day and night. She further testified that the deceased was, on account of her not being able to control her intestinal and urinary organs, filthy, and thus her mother was required to change the bedding of the deceased several times a day; that the deceased was an incessant smoker of cigarettes, indulged in beer and whisky every day, and was a user of morphine or some other narcotic; that she had the habit of constantly expectorating, and that after her death the room which had been occupied by her was in a very unsanitary condition and that the bedding was left in such condition as to necessitate its destruction by fire. The witness testified that her mother was and had been for many years a practical nurse in Eureka, and that during the period of time that the deceased was at her home her mother was unable to take any outside cases. She stated that she was familiar with the compensation ordinarily paid nurses in Eureka and that such compensation amounted to $2.50 per day or $5.00 per day where the nurse's services were given both day and night. In a word, this witness went into great detail as to the services rendered by her mother for the deceased and gave a vivid

description of the deleterious hygienic conditions which were
brought about at the home of her mother by reason of the
filthy personal condition of the deceased which followed
from the peculiar ailments from which she suffered during
the time that she was under the care of the plaintiff.

Mrs. Sievert's testimony was corroborated in many vital
particulars by other members of the Steinhofer family and
in a measure by neighbors of the Steinhofers. We see no
necessity for presenting herein a *résumé* of the testimony of
these witnesses. [1] We think that the testimony was
sufficient, if believed by the jury, as evidently it was, to
warrant the conclusion that the agreement between Mr.
Puter and Mrs. Bertha Steinhofer, as originally made, did
not include services as a nurse and the constant attention
which, it was developed after the deceased had been in the
home of the Steinhofers for a short period, was absolutely
necessary to make her as comfortable as she could be made
under the circumstances, and that Mr. Puter, subsequently
to the making of the original agreement, promised to pay
Mrs. Steinhofer additional compensation for her services
as a nurse. Indeed, it is not probable that Mrs. Steinhofer
would have agreed to furnish the deceased with board and
lodging and give her entire time and attention to nursing
her, as the description of her physical condition would show
was required, for the sum of $25 per month. In fact, it
can be declared as a matter of common knowledge that $25
per month, even at the time at which Mrs. Carroll was
taken to the home of Mrs. Steinhofer, involved a sum for
such accommodation rather below the price at which such
accommodation could ordinarily then be obtained. Cer-
tainly at the present time no such accommodation could be
obtained at that price. These considerations, it seems to us,
support the testimony of Mrs. Sievert, tending to show
that an amended agreement was made between Puter and
Mrs. Steinhofer covering the compensation she should re-
ceive for services additional to that stipulated in the origi-
nal agreement whereby she was merely to furnish board
and lodging to the deceased.

In addition to the testimony above adverted to, it also
appeared that deceased, during her residence at Mrs. Stein-
hofer's, was attended by three different physicians. One
of these, Dr. Walsh, testified that the deceased was afflicted

with lung and heart trouble; that she was, on the several occasions he attended her, in a very feeble condition. Dr. Walsh also testified that he was familiar with the compensation ordinarily paid practical nurses in the city of Eureka, and that $2.50 per day and board constituted the amount usually paid where the services were performed during the daytime and double that amount where the nurse was required to attend the patient both day and night.

It is very clear from the testimony that the amount claimed by Mrs. Steinhofer and allowed by the jury for the services she rendered as a nurse to the deceased, when measured by the face value of the testimony describing the physical condition and personal habits of the deceased while she was under the charge of Mrs. Steinhofer, involved only a fair and reasonable return for such services.

It was admitted that $490 had been paid Mrs. Steinhofer on account, which Puter claimed was paid under the agreement as it was originally made. There is no direct testimony that any other sum was paid by Puter to Mrs. Steinhofer. [2] The proof of the services rendered was, however, sufficient to entitle the plaintiff to recover any balance that might be due her, the burden of proving the payment of the account being upon the defendant. (*Stuart* v. *Lord*, 138 Cal. 672 [72 Pac. 142].)

We now come to the consideration of the rulings respecting certain evidence of which the defendant complains.

The witness, Mrs. Sievert, in explaining the purport of the several conversations she overheard between her mother and Puter relative to the providing by Mrs. Steinhofer of board and lodging to the deceased, stated that in said conversations "there was no agreement made about her care." To that statement counsel for defendant objected and moved that it be stricken out and so expunged from the record. The court overruled the objection and denied the motion. The grounds of the objection and the motion were that the testimony was incompetent, irrelevant, and immaterial. If it was objectionable at all, it was on the ground first stated—that is to say, that the statement appears to be the conclusion of the witness. But, from her previous testimony, we conclude that what she thus intended to say was that no stipulated sum, in addition to the sum at which Mrs. Steinhofer agreed to provide the de-

ceased with board and lodging, had been agreed upon between Puter and Mrs. Steinhofer for any services as a nurse which the latter might perform for deceased. The witness repeatedly declared that, in the several conversations between Puter and her mother relative to deceased and to which she was a listener, Puter invariably stated in effect that he desired Mrs. Steinhofer to give the deceased such care as the exigencies of her physical condition might from time to time or at any time require, and that "I will pay you well, . . . , I will do well by you." This was competent testimony for the purpose of showing that no agreement was made between Puter and Mrs. Steinhofer whereby the latter was to receive for her services as a nurse certain specified compensation. In other words, it tended to show that no definite amount to be paid to her for her services was agreed upon. Therefore, if it is to be conceded that the statement complained of involved incompetent testimony, it is, nevertheless, clear that there was sufficient competent testimony to overcome or so neutralize the effect thereof as to justify the conclusion that said statement could not have produced in the trial of the case a baleful influence against the just rights of the defendant. Indeed, if the meaning of the statement referred to is what we assume it to have been intended to be by the witness, to wit, that no stipulated compensation had been agreed upon between Puter and Mrs. Steinhofer for the latter's services as a nurse, then the testimony involved merely the statement of a fact and was perfectly proper.

[3] The next assignment involves a ruling which was obviously erroneous and, while affecting one only of the counts set out in the complaint, was plainly damaging to the rights of the defendant commensurately with the scope of its application to the issues. The ruling to which we now refer arose under the following circumstances: Mrs. Sievert, addressing her testimony to the third cause of action of the complaint, in which it is alleged that Mrs. Steinhofer advanced and expended the total sum of $69.43 for goods had and received by the deceased during the latter's lifetime and while she was at the home of Mrs. Steinhofer, stated that she (the witness) kept a written itemized account of the moneys so advanced by her mother, having first put the items down on loose paper and thereafter and on

the same occasion transferred all said items to a book. This book was not introduced in evidence as a book account, but the witness, Mrs. Sievert, in testifying to the asserted correctness of the items making up the purported account, was permitted to use said book for the purpose of refreshing her memory as to said items. (Code Civ. Proc., sec. 2047.) But we are of the opinion that the book was not only incompetent as evidence of the correctness of the alleged account but also that it did not constitute a proper memorandum from which the witness was authorized to refresh her memory, except in so far as there might be articles itemized in the book as having been procured for the deceased which were procured and purchased by the witness herself. Section 2047 of the Code of Civil Procedure, *supra*, provides in part: "A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing."

Manifestly, said section refers to a fact of the existence or occurrence of which the witness himself has personal knowledge. In other words, the fact as to which he may refresh his memory must be one which he has derived knowledge of from or through his own perceptions (Code Civ. Proc., sec. 1845) and not a fact which has come to his knowledge only through the statement or declaration of some other person, unless such statement or declaration is itself the fact in dispute or to be proved. The testimony of Mrs. Sievert as to her knowledge of the purchase by her mother of the various articles contained in the account-book is in part as follows:

"Q. I will ask you if that is the book in which you kept the accounts (handing witness book)? A. Yes, sir. Q. And those accounts were furnished you by your mother? Mr. Puter: I desire to see this book and desire to object to it as incompetent, irrelevant, and immaterial. Court: Present it to defendant's counsel, please. Counsel for plaintiff: Q. I will ask you if these items were all in your handwriting? A. Yes, sir. . . . Q. Now, Mrs. Sievert, you say she [Mrs. Carroll] was there for a period of twenty-one months? A. Yes, sir. Q. And you kept the items of book account? A.

Yes, sir. Q. During that time? A. Yes, sir. Q. And you also entered in the book items of articles that were furnished by your mother to Mrs. Carroll? A. Yes, sir. Q. I will ask you if these are the items [shows witness]? Mr. Puter: We object until he asks the question; may it please the court, we desire to ask the question when these items were made, before he goes into details. Court: Very well. Mr. Puter: I want to ask the witness, this is the book, is it, that I hold in my hand that you put down the record of the account your mother had with Mrs. Carroll? A. Yes, sir. Q. That is the charge? A. The record I kept track of it all the time, every time she got something I put it down in this book. Q. Every day? A. Yes, sir. Q. In other words, this was your account-book when she was first there in 1915 and along, and from that time on every day or two you came there your mother would give you the different items which you wrote down in this book? A. Just what there was. . . . By counsel for plaintiff: Q. Now, I wish you to examine this account-book and say whether or not you know that these items were furnished, actually furnished, and paid for by your mother and furnished to Mrs. Carroll at Mrs. Carroll's request? A. Yes, sir. Q. These items you have here? A. Yes, sir. Q. Now, these are the items of account *that were furnished you by your mother?* A. Yes, sir. Q. The *items were furnished you* and you entered them in the book day by day? A. Yes, sir. Q. And these were the items that were furnished you at the time? A. Yes, sir. . . . The Court, after objection to the above examination of the witness: Take the first item and ask her if she knows of her own knowledge that her mother got it, it will be all right, but, if she took her mother's word for it, it will be hearsay. The Witness: I got some of the things myself. Q. (By counsel for plaintiff): Some of these items you have put down here you bought yourself? A. Yes, sir. Q. And you know Mrs. Carroll got them? A. Yes, sir. Q. As to these items, they were practically all items of whisky and tobacco? A. Yes, sir. Q. Did you during all the period that she was there know of her having whisky and tobacco furnished her in the house? ` A. Yes, sir. Q. Now, could you at this time swear to the correctness of each one of the items? A. Yes, sir. Q. Of your own knowledge? A. Yes. I know they

were gotten. I know my brother got some, my father got some of the things. I know he had to go down at night at 11 o'clock to get some for her, when she did not have enough whisky at nights. Q. I understand that these things were written from your own knowledge and put down there yourself? A. Yes, sir, I would always write down. *If I happened not to be over for a couple of days* she [witness' mother] would mark it down. Court: What she knew herself would be all right, not what her mother told her and then wrote down—that would be hearsay. Witness: I know she got the things. Court: You saw the things then? A. Yes, I saw the articles—*that is the reason I know*. Q. (By counsel): You know that the things were furnished and for her in the house? A. Yes, sir. Q. And you know that of your own knowledge? A. Yes, sir.''

It is not a far-fetched conclusion from the above testimony that, with the exception of a few articles which she claims to have personally purchased or procured herself, Mrs. Sievert obtained whatever knowledge she possessed of the purchase of the articles enumerated in the book kept by her from information received by her from her mother. Indeed, it will be observed from the above excerpts from her testimony that the witness directly admitted that she inserted the several items of purchase in the book as they were given to her by her mother. She further stated, it will be noted, that when it happened that she did not visit her mother's home for a day or two, she would take the items from a memorandum kept by her mother on those days and transfer them to the book. It is perfectly clear, when considering in its entirety her testimony relative to the alleged book account, that Mrs. Sievert had no personal knowledge of the fact of the purchase of many, if not most, of the articles put down in said book, but, as above stated, obtained such knowledge as she had of such purchases from Mrs. Steinhofer. It is true that she asserted, in a positive manner, it seems, that she personally knew that the items in the book were correct and that the total of the advancements made by her mother as so evidenced was correct. But it is plainly manifest, from her own testimony, that, if she meant thus to say that she personally knew that the articles enumerated in the book, except such of them as she might herself have procured, were actually

54 Cal. App.—36

purchased by her mother, her statement in that respect was
wholly incredible. She could have truthfully said that the
entries in the book as she inserted them therein were cor-
rect—that is to say, that she correctly entered the items as
they were furnished by her mother; but, upon the face of
her testimony, it is clear that she could not truthfully
state that she knew of her own knowledge or otherwise than
from the information received from her mother that the
latter actually purchased the same. The testimony of the
witness, with the exception of that part thereof to the
effect that she herself had purchased some of the articles,
was manifestly incompetent, not alone because it was hear-
say (*San Francisco Teaming Co.* v. *Gray,* 11 Cal. App.
314 [104 Pac. 999]), but also for the reason that its effect,
if it were allowed to stand, would necessarily be to permit
an evasion of section 1880 of the Code of Civil Procedure—
that is to say, the effect of the testimony would be to
permit to be done indirectly what said section positively
declares cannot be done directly, viz.: admitting as in proof
of the claim against the estate of a deceased person the
testimony of the claimant. It follows that said testimony
was wholly insufficient to justify the implied finding of the
jury that the third cause of action of the complaint was
sustained. Indeed, we think that, as to said cause of action,
had a motion to that end been submitted, the court below
could justly have adopted no other course than to grant
a motion for a nonsuit; and this, too, in the face of the
fact that Mrs. Sievert testified that she herself procured
for her mother certain of the articles set down in the book.
While she was, of course, competent to testify as to the
articles that she purchased herself, her testimony in that
particular was so indefinite and uncertain and unsatisfac-
tory that a definite finding could hardly with justice have
been made or educed therefrom. She failed to point out
the particular articles or the number thereof which she
personally procured and thus the difficulty of determining
how much the plaintiff would be entitled to for the ad-
vancements made by her through the purchases made by
Mrs. Sievert is plainly apparent. It is reasonably inferable
from her testimony that the witness herself personally pro-
cured very few of the articles charged in the book against
the deceased. Under all these circumstances, we think that

the. entire testimony of Mrs. Sievert addressed to the third cause of action should have been disregarded by the jury and we, therefore, conclude that it is the duty of this court to make an order in its judgment herein in accordance with this view.

Accordingly, the following order or judgment is hereby rendered: That if the plaintiffs, within thirty days from the filing of this opinion, remit in due and proper form the sum of $69.43 of the amount awarded them by the verdict and judgment in this case, the said judgment shall stand as affirmed, but if the plaintiffs fail or refuse within said time to remit said sum ($69.43) from said judgment, then the judgment appealed from will stand as reversed and the cause remanded for a new trial.

Burnett, J., and Finch, P. J., concurred.